ACCEPTED
01-15-00733-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
10/8/2015 11:27:27 AM
CHRISTOPHER PRINE
CLERK

No. 01-15-00733-CV
In the Courts of Appeals for the
First District of Texas at Houston, Texas

—————————————————————————

In the Interest of D.R.L., Child

—————————————————————

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
10/8/2015 11:27:27 AM
CHRISTOPHER A. PRINE
Clerk

**JEM, Appellant**

**v.**

**Department of Family & Protective Services, Appellee**

—————————————————————————

On appeal from the Harris County District Court
313th Judicial District; No. 2014-03703J

—————————————————————————

**APPELLEE'S BRIEF**

—————————————————————————

VINCE RYAN
COUNTY ATTORNEY
State Bar #99999939
Sandra D. Hachem (SBN 08667060)
Sr. Assistant County Attorney
1019 Congress, 17th Floor
Houston, Texas 77002
Telephone:  (713) 274-5293
Facsimile:  (713) 437-4700
Email: sandra.hachem@cao.hctx.net
ATTORNEY FOR APPELLEE,
DEPARTMENT OF FAMILY &
PROTECTIVE SERVICES

# **TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................... ii

INDEX OF AUTHORITIES................................................................................ iii

ABBREVIATIONS ............................................................................................. iii

STATEMENT OF THE CASE............................................................................iv

REPLY POINT ....................................................................................................iv

STATEMENT OF FACTS ...................................................................................1

SUMMARY OF ARGUMENT ..........................................................................13

ARGUMENT AND AUTHORITIES.................................................................14

**REPLY POINT:** **The evidence sufficiently supported the court's findings for termination of JEM's parental rights. ............................................14**

PRAYER FOR RELIEF ......................................................................................20

CERTIFICATE OF SERVICE ...........................................................................20

CERTIFICATE OF WORD COUNT COMPLIANCE...........................................20

# INDEX OF AUTHORITIES

**CASES**                                                                      **PAGE**

*In re B.L.D.*, 113 S.W.3d 340 (Tex. 2003) ............................................................15

*In re C.H.*, 89 S.W.3d 17 (Tex. 2002).. ............................................................ 19

*Holick v. Smith*, 685 S.W.3d 18 (Tex. 1985) ......................................................16

*Lehr v Robertson*, 463 U.S. 248, 261-62 (1983)................................................16

*Phillips v. Tex. Dept of Prot. & Reg. Servs.,* 25 S.W.3d 348
  (Tex. App.—Austin 2000, on pet.). ..................................................................18

*Tex. Dept. of Prot. & Reg. Servs. v. Sherry*, 46 SW.3d 856 (Tex. 2001) ................15

**STATUTES**

Tex. Fam. Code Ann. §160.201 (West 2008)......................................................16
Tex. Fam. Code Ann. §160.204 (West 2008)..................................................16, 17
Tex. Fam. Code Ann. §161.002 (West 2008)..................................................16, 17

# ABBREVIATIONS

In this Brief, the following abbreviations will apply:

**PARTIES**
JEM:  refers to the Appellant, the Father/Respondent.
ML: refers to the Mother, the Respondent at trial.
DL:: refers to the oldest child (only child at issue in appeal by JEM)
CL and AL:  refers to the two youngest children

**APPELLATE RECORD**:
CR:  refers to the Clerk Record
RR-2: refers to 2nd Volume of Reporter's Record from trial of testimony.
RR-3: refers to 3rd Volume of Reporter's Record from trial of exhibits.
RR-4: refers to 4rd Volume of Reporter's Record from trial of exhibits.

## STATEMENT OF THE CASE

The present appeal is from a parental termination judgment involving three children (DL, CL, & AL). CR[1] 39-40. The Department filed a suit for protection of these children on July 3, 2014. CR 3. A judgment was signed on August 18, 2015 after a bench trial that terminated the parent-child relationships of ML (mother of the children), CW (father of CL and AL) and JEM (alleged father of DL) and DL's unknown father. CR 41-42. Per Tex. R. Civ. P. 306, the judgment recited Section 161.002 of the Family Code as the ground for termination of JEM's parental rights. CR 41-42. The judgment recited Section 161.001(1)(D)(E)(O) and 161.001(2) of the Family Code for termination of ML's parental rights.

A timely notice of appeal was filed by JEM on August 31, 2015. CR 49. A late notice of appeal was filed by the mother (ML) on September 16, 2015 and this court permitted that late filing by order September 29, 2015. This brief only responds to the brief of the alleged father JEM which relates solely to the child DL. ML's brief has not yet been filed.

## REPLY POINT

**Reply Point: The evidence sufficiently supported the court's findings for termination of JEM's parental rights.**

---

[1] In this brief "CR" refers to the Clerk's record filed in this appeal.

No. 01-15-00733-CV
In the Courts of Appeals for the
First District of Texas at Houston, Texas
_____

In the Interest of D.R.L., Child
_____

**JEM, Appellant**

**v.**

**Department of Family & Protective Services, Appellee**

_____


On appeal from the Harris County District Court
313th Judicial District; No. 2014-03703J
_____

**APPELLEE'S BRIEF**


TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

Department of Family & Protective Services, Appellee, [hereinafter "Department"] submits this brief in response to the brief of JEM.

**STATEMENT OF FACTS**

According to ML, JEM was in and out of prison most of his life and he reportedly abused alcohol and drugs. RR-3 p. 191 ML met JEM in 2005 after one of those occasions when he was out of prison and they had a "1 night stand." RR-3

p. 191.  JEM was married to another woman.  RR-3 p. 191.  ML told JEM when she learned she was pregnant.  RR-3 p. 191.

DL was born in the late summer of 2006.  RR-3 p. 9.  No father was named on the child's birth certificate and no father filed a claim of paternity for DL. RR-3 pp. 9 & 15.  Nevertheless, ML alleged JEM to be DL's father. RR-3 p. 191.

Not long after DL's birth, ML began using heroin. RR-3 p. 191 and 193. She began injecting heroin daily for about two years.  RR-3 p. 193. She also used amphetamines and "ICE" or crystal methamphetamines during the time she was using heroin. RR-3 p. 193.  In 2008 and 2009, The Department received numerous referrals regarding ML that included claims of physical abuse and neglect, neglectful supervision, and sexual abuse.  RR-4 p. 79.

One of the first referrals was that ML left a large bag of syringes within reach of her child and she would take the child with her on weekend drug binges. RR-3 p. 28. The child would return from these "outings" withdrawn and emotional. RR-3 p. 28.  The Department gave these referrals a disposition of: "Reason to Believe – Worked Family Based Safety Service."  RR-4 p. 79.

ML participated in Family Based Safety Services from June 2008 until February 2009.  RR-3 p. 28.  ML claimed she stopped using heroin not long after the Department's involvement and completed treatment and a transitional housing program for six months while DL was in custody.  RR-3 p. 193.

2

In May of 2009, there was an allegation that an uncle sexually abused DL. RR-3 p. 28. However, the case was ruled out. RR-3 p. 28. In July 2009, ML became pregnant shortly after beginning a relationship with CW, a man she met at an AA meeting. RR-3 p. 197.

In December of 2009, there was another allegation of sexual abuse in which DL exhibited age-inappropriate sexual acting out behavior including inserting a plastic spoon in the vagina of another girl. RR-3 p. 28. This claim of sexual abuse received a disposition of "unknown." RR-3 p. 28. A couple of months later, another referral was made in which it was reported ML and CW were seen pinching and shaking DL. RR-3 p. 28. The case was ruled out. RR-3 p. 28.

DL's younger half siblings, CL and AL, were born in the early spring of 2010 and 2011. RR-3 p. 10-11. CW was the father of both those children, but he was not a healthy influence as he physically assaulted ML, used drugs in the presence of the children and did not contribute to the children's care. RR-3 p. 197.

In September 2010, the Department received a referral regarding CL when he was 8 months old. RR-3 p. 28. It was observed that he had extensive bruising to his shoulders and down his neck, but it was unknown how the bruises occurred. *Id.* The case was ruled out. *Id.*

In March, August and December of 2011, referrals were made to the Department of neglectful supervision that were ruled either "Unable to determine"

3

or "Ruled Out." RR-4 p. 79. In that same year, ML was convicted of stealing and given probation, but her probation was revoked and she spent 90 days in jail. RR-3 p. 194. Later that same year, ML received deferred adjudication after she pled guilty in connection with an offense committed in 2010 involving tampering with government records in which she wrote unauthorized checks on purchases at a thrift center. RR-3 p. 2015 and RR-3 p. 194. She was placed on probation for that charge for three years. RR-3 p. 194.

In 2012, the Department received four referrals involving neglectful supervision and sexual abuse. RR-4 p. 79. In the first referral in 2012, it was reported that the mother was seen under the influence of something while caring for the children. RR-2 p. 29. In the second referral that year, it was alleged the children were at risk of harm because of the mother's drug use and DL made an out cry about her mother getting a needle in her arm by "Andy." RR-3 p. 29. Before the end of the year, it was reported that DL witnessed the 2 year old sibling having oral sex performed on him by a 10 year old friend. RR-3 p. 29-30. These referrals in 2012 received a disposition of ruled out. RR-3 p. 29-30.

In the later part of 2012, from about September until April 2013, ML was placed in jail because her probation was revoked on her earlier tampering with government records charge. RR-3 p. 194 and RR-3 p. 215. It was apparently around that time that ML's children were cared for by JEM and his wife. RR-3 p.

4

191. ML's daughter DL, then around 5-6 years old, stayed there for about 7 months. RR-3 p. 194 and p. 191. ML stated she believed her children were mistreated while staying with that family. RR-3 p. 191 and p. 194.

A few months after ML was released from jail, in October of 2013, ML used Ecstasy for the first time. RR-3 p. 193. She claimed she only used it a couple of times though and claimed her last use was with CW (father of her two youngest children) in February of 2014. RR-3 p. 193. ML was on parole at the time and risked incarceration by this drug use. RR-3 p. 194. However, she told her parole officer about the use and the officer did not seek to revoke her parole. RR-3 p. 194.

In March of 2014, the Department received another referral alleging physical abuse, neglectful supervision and physical neglect. RR-4 p. 76-77. It was reported that the mother would bounce from home to home and sleep in the car with her children. RR-4 p. 77. It was also reported that the mother alienated most of her family due to her long drug use history and theft. *Id.* It was also reported that the father of the two younger children allegedly had a history of violence and untreated mental health issues that ML knew but allowed her children to be around. *Id.*

In April of 2014, a Department worker visited with DL. RR-3 p. 25. DL told the worker that CW (father of her two younger siblings) smoked weed. RR-3 p. 25. She also stated that CW chopped pills on a tray and sniffed it with his nose. RR-3 p. 2. She thought the drug was called "molly." RR-3 p. 25. That same day,

the worker spoke with the child's mother. RR-3 p. 25. She stated that DL's biological father (JEM) was currently in jail in Rusk, Texas and she did not have contact with him. RR-3 p. 25. She stated that CW, the father of her two other children, visited them weekly. RR-3 p. 25.

The mother admitted she used drugs in the past including marijuana, cocaine, and heroin but denied any current use and said she had been sober since 2012. RR-3 p. 25. ML acknowledged CW smoked marijuana but denied knowing he used in front of the children. RR-3 p. 196. ML acknowledged her relationship with CW had been harmful for her children and stated she ended the relationship. RR-3 p. 196. The mother denied she had the children sleep in a truck. RR-3 p. 25. Nevertheless, when the worker spoke with the mother's father, he told the worker ML admitted to him that she had to sleep in the truck overnight and the children were scared. RR-3 p. 26. ML

Drug tests were done on ML and a lab representative informed the worker that something was wrong with ML's urine sample but the hair follicle test returned positive for amphetamines and cocaine. RR-3 p. 26. When the worker confronted ML about the results, she denied she used meth or cocaine but she agreed to place the children with her mother under a safety plan. RR-3 p. 26.

The worker spoke with CW. RR-3 p. 27. He stated that he dated ML for seven years and was the father of her two younger children. RR-3 p. 27. He

6

acknowledged he was not the father of her oldest child (DL) but stated he was like her father because he had known her since she was 18 months old. RR-3 p. 27.

CW admitted to smoking weed regularly but stated he did not smoke in front of the children. RR-3 p. 27. He denied the children ever slept in a truck. RR-3 p. 27. He denied ML ever used drugs, but stated if she did it was because her parents stressed her out by making her choose between him and them. RR-3 p. 27. When advised that DL wrote a letter at school that he choked her mom, he stated she fabricated the story. RR-3 p. 27.

Later that same month, the worker noted CW did not complete the drug test requested from him, and ML called and told her that CW was no longer in communication with the children. RR-3 p. 27. In June of 2014, the Department learned the grandmother returned the children to the mother. RR-3 p. 27. When the Department called the grandmother, she stated she was only willing to care for DL and would need to cancel the safety agreement. RR-3 p. 28. July drug test results from ML returned positive for opiates and codeine. RR-3 p. 28. When the worker was unable to contact the mother by phone to talk about the results, the maternal grandmother told the worker that the mother had not made herself available for a few days and she did not know where she was. RR-3 p. 28.

The Department filed an affidavit with the court detailing the facts and requesting temporary managing conservatorship of the children with a suit for the

children's protection. RR-3 p. 31; CR 3. An emergency order was signed by the court on July 3, 2014 that placed the children in the Department's temporary managing conservatorship. RR-3 p. 34, 36. Notice was given to ML, CW and JEM of the adversary hearing on July 15, 2014. RR-3 p. 40.

On July 15, 2014, an order was signed that continued the Department's appointment as temporary managing conservator and ordered the parents, including the alleged father JEM, to comply with the Department's service plan. RR-3 p. 49-50. The order warned that failure to comply could result in termination of parental rights. RR-3 p. 50.

On July 17, 2014, an answer was filed by JEM's attorney with a general denial. CR 33. The answer did not claim JEM was the child's father and did not request paternity be established. CR 33.

On August 25, 2014, a Family Service Plan was filed with the court for JEM. RR-3 p. 83. The plan required that he maintain stable housing and employment, participate in DNA testing, maintain contact with the child and some psychological and drug abuse prevention related services. RR-3 p. 85-86. On August 29, 2014, JEM was officially served with a copy of the Department's original petition. RR-3 p. 5. A few days later, the status hearing was held and his appointed attorney appeared on his behalf. RR-3 p. 55. The court ordered that the plan of service filed with the court for JEM was approved and made an order of the

court. RR-3 p. 58. On September 2, 2014, the court signed a separate order for return of the children which required all of the parents, including JEM, to not only complete the family plan of service but to also refrain from drug and criminal activity. RR-3 p. 93.

In May of 2015, the Department filed a report with the court noting that it had no information regarding JEM and the mother stated she had no information about him. RR-4 p. 93. A couple months later, on July 2, 2015, trial proceeded. RR-2 p. 1. The appointed attorney for JEM appeared, but JEM was not present. RR-2 p. 5.

The first witness was Stephanie Samuel, the caseworker assigned for the children. RR-2 p. 8. She confirmed at the time of trial, DL was 8 years of age and her two younger siblings were 4 and 5 years of age. RR-2 p. 8. She stated that DL was in a relative placement and the other two siblings were in foster homes where their physical and emotional needs were being met. RR-2 p 8-9.

Stephanie stated that she had not heard from JEM at all during the pendency of this case. RR-2 p. 12. She also stated that her predecessors with CPS did not have contact with JEM. RR-2 p. 15. She stated she looked for him in the jails and spoke with the mother about him and did diligent searches in trying to locate him. RR-2 p. 17. Stephanie also noted that no one ever came forward claiming to be DL's father and they did a search for potential fathers. RR-2 p. 18.

Stephanie confirmed that a family service plan was mailed to JEM but it was returned. RR-2 p. 16. Consequently, she could not say he ever saw it or personally knew what was required of him. RR-2 p. 16. She also noted that the mother did not complete her service plan and CW did not do his services. RR-2 p. 11.

Stephanie stated that the children had a lot of issues. RR-2 p. 35. The children are subject to very emotional outbursts. RR-2 p. 38. AL has defensive issues toward her brother CL who would physically abuse her and committed sexual behavior and that was why the court separated them. RR-2 p. 35-36. She also noted that AL was still in therapy, but progressing in her current adoptive placement. RR-2 p. 36. CL was moved in a placement where it was believed the provider could provide an adoptive placement. RR-2 p 39-40.

DL was placed with a grandmother. RR-2 p. 40. Stephanie indicated she could be adopted there, but there were some concerns and, therefore, approval was only tentative. RR-2 p. 42. She acknowledged that this young child had made suicidal outcries and was in therapy. RR-2 p. 40. She also noted she had issues with her sibling AL and DL who told her she was not part of her family anymore. RR-2 p. 41. Stephanie stated she believed it would be in the children's best interest if the court terminated the parental rights of the parents of these children so they could receive a permanent placement. RR-2 p. 41.

The next witness was Jennifer Cassidy, the child advocate. RR-2 p. 44. She agreed with the caseworker's assessment. RR-2 p. 44. She noted the children had a great deal of upheaval in their lives and all of them had psychological and psychiatric issues requiring therapeutic intervention. RR-44 and 49. DL, in particular, was removed when she was very young and her mom had drug issues. RR-2 p. 45. Though the mother completed services and was clean for a time, she relapsed and the result was instability for all these children. RR-2 p. 45.

The children's mother (ML) testified next. RR-2 p. 50. She acknowledged that her oldest child DL was removed in 2008 in Montgomery County and that she was using heroin at the time. RR-2 p. 50. She also acknowledged after she went to inpatient treatment, she relapsed two years later with methamphetamines. RR-2 p. 51. She attempted to minimize that, however, by stating it was not very regular use. RR-2 p. 51. She claimed she only used once every couple months for about six months. RR-2 p. 51.

ML stated she loved her children and received a letter from DL at some unspecified time about how she missed her and wanted to come home. RR-2 p. 56. She also stated that AL had stated he wanted to go home. RR-2 p. 56. She stated her plan was to get a bigger apartment and continue working and caring for her children and going to AA meetings. RR-2 p. 56-57.

ML acknowledged that her children were physically and sexually abused when she was in prison. RR-2 p. 67. She also acknowledged that she saw CW in January of that year and he assaulted her on her way to work. RR-2 p. 69. She said he got arrested though. RR-2 p. 69.

The court signed the decree terminating the parental rights of ML, CW and JEM the same day as trial. CR 38. The decree established the parent-child relationship between CW and the children AL and ML, but the decree did not make a finding regarding the paternity of any parent of DL. CR 40. The decree terminated the parent-child relationship of CW, the children's mother ML, and the unknown father of DL as well as DL's alleged father [JEM]. CR 42-43. Pursuant to Tex. R. Civ. P. 306, the decree made the following factual findings as grounds for termination of JEM's parental rights:

> The Court finds by clear and convincing evidence that, after having waived service of process or being served with citation in this suit, [JEM] did not respond by timely filed an admission of paternity or by filing a counterclaim for paternity or for voluntary paternity to be adjudicated under chapter 160 of the Texas Family Code before the final hearing in this suit.

CR 42. The court also found that termination of the parental rights of DL's unknown father was warranted, because "he has not registered with the paternity registry, and after exercise of due diligence by the Department, his identity and location are unknown." CR 42.

12

## SUMMARY OF ARGUMENT

The Appellant's Brief of the Alleged Father (JEM) challenges the sufficiency of the evidence to support the findings in support of the court's decision to terminate his alleged parental rights. Namely, the brief challenges the legal and factual sufficiency of the evidence to support the court's findings that termination was in the child's best interest and that JEM failed to assert paternity as provided under Section 161.002 of the Family Code.

With respect to the court's finding under Section 161.002, Appellant's Brief essentially argues that the evidence is insufficient, because it is unfair that Section 161.002 permits an alleged father to lose parental rights for failing to respond to a suit for parental termination. It is also argued that it should be construed insufficient, because it is unconstitutional to allow parental termination under such a broad scheme. Such claims do not establish the evidence is insufficient and because the claims of unconstitutionality and unfairness were never raised in the court below they were not preserved to be considered in this appeal.

With respect to best interest, appellant's brief essentially argues that the evidence for this finding is insufficient because the caseworker's testimony that she had no idea where JEM was at the time of trial should be considered unbelievable. Nevertheless, a finding of best interest was not even required in this case since JEM never claimed to be the child's father to invoke the need for such

finding. In addition, because he did not claim paternity and essentially never did anything for this child, the evidence conclusively supported this finding.

Namely, the subject child was nearly nine years old by the time of trial and JEM never adjudicated or established his right as the child's father during the child's lifetime. As an alleged father, he was officially given notice and an opportunity to do something for this child and claim paternity after he was served by personal service with the present suit. Nevertheless, he did not and never did anything during the pendency of this case for this child. Such evidence supported the court's conclusion that the Department's efforts and plans for the child, as opposed to his complete failure to act for the child, provided sufficient and conclusive support for the court to find termination of his rights as an alleged father was in the best interest of DL. The challenges to that finding should be denied and the judgment affirmed.

## ARGUMENTS AND AUTHORITIES

**REPLY POINT: The evidence sufficiently supported the court's findings for termination of JEM's parental rights.**

While the Appellant's Brief of JEM frames its claims for error as challenges to the legal and factual sufficiency of the evidence to support the court's finding under Section 161.002 of the Family Code, that is not really what is being claimed. The court's finding in the judgment, consistent with the wording of Section 161.002 of the Family Code, found that the alleged father JEM, after being

14

personally served with citation, did not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160 of the Family Code. CR 42; Tex. Fam. Code Ann. §161.002 (West. 2008). The proof in the record for that finding was undisputed and nothing in the record compromises the support for that finding. *See* RR-3 p. 5 (JEM personally served with Department's petition); CR 33 (JEM's answer did not claim paternity); RR-3 p. 9 (No father named on child's birth certificate); RR-3 p. 191 (JEM not married to ML, because he was married to somebody else); RR-3 p. 15 (no man claimed paternity of DL with paternity registry); RR-2 p. 12 and 15 (Department representatives did not hear from JEM during case). Appellant's Brief does not challenge that proof.

What the Appellant's Brief is essentially arguing instead is that the process for termination of parental rights under Section 161.002 of the Family Code is fundamentally unfair and unconstitutional. However, those claims were not raised in the trial court. As such, those claims were waived. *See In re B.L.D.*, 113 S.W.3d 340 (Tex. 2003) (failure to challenge jury charge based on alleged unconstitutional impact was waived since it was not raised at trial); *Tex. Dept. of Prot. & Reg. Servs. v. Sherry*, 46 SW.3d 856, 861 (Tex. 2001) (claim asserting it was unconstitutional for statute of limitations to bar paternity suit was waived since it was not raised in trial court); Tex. R. App. P. 33.1.

15

Moreover, there is no basis to claim a fundamental error that could avoid the requirement for preservation. It is acknowledged that the involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.3d 18, 20 (Tex. 1985). However, nothing in the record proves JEM had a protected constitutional right in a parent-child relationship with DL in order for this fundamental interest to even be claimed.

A constitutionally protected parent-child relationship is not established on the mere allegation of paternity. *See* Tex. Fam. Code Ann. §160.201(b) (West 2008) (how father-child relationship established); *Id.* §160.204 (how presumption of fatherhood established). A man who believes he is the biological father of a child but never marries the child's mother is not automatically recognized to have a fundamental constitutional protection as a parent merely because of a biological link. *See Lehr v Robertson*, 463 U.S. 248, 261-62 (1983). The unwed father has to do something to permit that constitutional protection to be legally recognized. *Id.*

In this case, the child at issue was approximately nine years old at the time of trial. RR-3 p. 9. There is no evidence JEM did anything to assert his right to care for that child during those nine years, including during the turbulent years this child was exposed to a drug addicted mother who made negligent lifestyle choices. If JEM wanted to ensure his constitutionally protected rights in connection with a parent-child relationship with DL, he needed to do something that would have

invoked recognition of him as a parent of that child under the law. Under the laws of this State, those actions could have included: (1) marrying the mother at least 301 days before or during the time the child was born; (2) marrying the mother after the child's birth and claiming paternity in a record filed with the bureau of vital statistics, permitting his name to be on child's birth certificate or promising in a record to support the child; (3) continuously residing with the child for the first two years of the child's life and representing to others that the child was his own; (4) filing an effective acknowledgement of paternity under Subchapter D of Chapter 160 of the Family Code*;* (5) obtaining an adjudication as to paternity; or (6) adopting the child.  *See* Tex. Fam. Code Ann. §§160.201 and 160.204 (West 2008).  JEM did not do any of those things.

In this state, when a man does not do anything to ensure he is legally recognized as a child's parent, but someone else alleges him to be the child's father, that man's parent-child relationship, if any, is subject to termination when, after legal process, it is shown the man alleged to be a father does not assert paternity. Namely, parental termination can be ordered against a man alleged to be a possible biological father under Section 161.002 of the Family Code if "after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160 of the Family Code." Tex. Fam. Code Ann. §161.002 (West. 2008).  In this case, the trial court found

17

parental termination warranted on that basis, and, as already discussed the evidence in support of that finding was conclusive. CR 42. Because the evidence was conclusive and JEM never did anything to permit a court to consider him to have a protected right as DL's parent, there is no basis to consider the claims of unfairness and unconstitutionality that are being claimed in this appeal. Such claims should be denied or dismissed.

**2. A best interest finding is not required under Section 161.002 of the Family Code, and the evidence is conclusive that termination of JEM's parental rights was in the child's best interest.**

In this state, Section 161.002(b)(1) of the Family Code allows a court to terminate an alleged biological parent's parental rights on a finding that the parent was personally served with a suit for termination and did not assert paternity. *See Phillips v. Tex. Dept of Prot. & Reg. Servs.,* 25 S.W.3d 348, 357 (Tex. App.—Austin 2000, no pet.). As already discussed, that was proven. It was not required that the State also prove that termination of JEM's potential parental rights was in the child's best interest to be entitled a judgment for parental termination under Section 161.002. It simply is not required under that section. *See* Tex. Fam. Code Ann. §161.002 (West Supp. 2014).

Nonetheless, appellant's brief essentially argues the trial court's decision was not in the child's best interest because the caseworker's testimony that she had no idea where JEM was at the time of trial should be considered unbelievable.

18

Such claim makes little sense considering JEM was not at trial, had not been part of this child's life during the pendency of this case and the trier of fact had the right to believe the caseworker's testimony.

In addition, the undisputed evidence supported the court's conclusion that termination of JEM's parental rights was in the child's best interest. Namely, the subject child was nearly nine years old by the time of trial, and JEM never sought to adjudicate, confirm or establish his rights as the child's father during the child's lifetime. As an alleged father, he was officially given notice and an opportunity to do something for this child and claim paternity after he was served by personal service with the present suit. Nevertheless, he did not and never did anything during the pendency of this case to either confirm his paternity or work for his child's welfare. A child's emotional and physical interests cannot be sacrificed merely to preserve a parent-child relationship. *See In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). Because the evidence was undisputed that the Department was providing for the child and making plans for the child's permanency, that plan, as opposed to JEM's complete absence of effort for the child's welfare, provided sufficient and conclusive basis for the court to find termination of his rights as an alleged father was in the best interest of DL. The challenge to such finding should be denied and the judgment affirmed.

WHEREFORE, PREMISES CONSIDERED, the Department requests that this court affirm the trial court's judgment and for such other and further relief to which it may be entitled in law or in equity.

Respectfully submitted,

VINCE RYAN
COUNTY ATTORNEY

By: */s/ Sandra Hachem*
**Sandra Hachem State Bar 08667060**
Sr. Assistant County Attorney
1019 Congress, 17th Floor. Houston, Texas  77002
Phone: 713/274-5293; Fax: 713/437-4700
Email: sandra.hachem@cao.hctx.net
Attorney for Appellee,
Department of Family & Protective Services

## CERTIFICATE OF SERVICE

I hereby certify that on this the 8th day of October, 2015 a true and correct copy of the foregoing brief was sent to all parties to this appeal by sending a copy by electronic transmission to the Appellant (JEM) care of his attorney of record, Donald Crane at donmcrane@gmail.com, and to the Attorney Ad Litem for the Children, William Connolly at his email address of: wbc@conlawfirm.com; and the attorney for the Appellant (ML) care of her attorney of record William Thursland at his email address of wmthursland@hotmail.com.

*/s/ Sandra Hachem*
Sandra Hachem

## CERTIFICATE OF WORD COUNT COMPLIANCE

This is to certify, pursuant to Tex. R. App. P. 9.4(i)(3), that the foregoing computer generated brief consists of no more than 15,000 words, excluding the caption, identify of parties and counsel, table of contents, index of authorities, statement of the case, statement of issues presented, statement of procedural history, signature, proof of service, certification, certificate of compliance and

appendix.  Relying on the word count of the computer program used to prepare this document, the number of words, subject to count under the rules, is <u>4,778 words.</u>

***<u>/s/ Sandra Hachem</u>***
Sandra Hachem
